Mistee L. Elliott (Bar #6-3540)
Holly L. Tysse (Bar #7-5553)
Crowley Fleck PLLP
101 W. Brundage
Sheridan, WY 82801
(307) 673-3000
melliott@crowleyfleck.com
htysse@crowleyfleck.com

Amanda L. Waesch (*Pro Hac Vice Forthcoming*)
Bryan E. Meek (*Pro Hac Vice Forthcoming*)
BRENNAN, MANNA & DIAMOND, LLC
75 E. Market Street, Akron, OH 44308
(330) 253-5060
alwaesch@bmdllc.com
bmeek@bmdllc.com

*Attorneys for Plaintiff JMK 3, LLC*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2020 JAN -6  PM 1: 44

MARGARET BOTKINS, CLERK
CHEYENNE

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| JMK 3, LLC, an Ohio limited liability company,<br><br>     *Plaintiff,*<br><br>v.<br><br>THE GENEUS GROUP, LLC, a Wyoming limited liability company,<br><br>     *Defendant.* | CIVIL ACTION NO. 20 CV 1 -J<br><br>JUDGE:<br>Johnson<br><br>**COMPLAINT: BREACH OF CONTRACT, PROMISSORY ESTOPPEL, AND UNJUST ENRICHMENT**<br><br>**Jury Demand Indorsed Herein** |

NOW COMES Plaintiff, JMK 3, LLC ("Plaintiff"), by and through the undersigned counsel, and for its Complaint against Defendant, The Geneus Group, LLC ("Defendant"), states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is an Ohio limited liability company with its principal place of business located in North Palm Beach, Florida.

2.      Defendant is a Wyoming limited liability company with a last known physical address of 610 W Broadway, Suite 201, Jackson, Wyoming 83001 and a last known mailing address of PO Box 12170, Jackson, Wyoming 83002.

3.      This Court has jurisdiction over this matter under 28 U.S.C. Section 1332(a)(1) on the basis of diversity of citizenship, because the amount in controversy exceeds $75,000.00, the parties are citizens of different states, and there is an actual controversy between the parties.

4.      Venue in the District of Wyoming is proper under 28 U.S.C. Section 1391(b)(1).

## FACTUAL ALLEGATIONS

5.      Plaintiff is an Ohio limited liability company engaged in the business of clinical laboratory management and marketing services.

6.      On or about July 1, 2019, while negotiating the terms of a formal agreement, but prior to execution of the same, Plaintiff began providing clinical laboratory management and marketing services to Defendant pursuant to an oral agreement.

7.      Upon demand by Plaintiff, Defendant has refused to pay to Plaintiff any amount of compensation for the services performed during July 2019.

8.      On or about August 1, 2019, Defendant, by and through its authorized agents, contracted with Plaintiff for the provision of certain services at an agreed flat monthly rate.  A copy of the Master Services Agreement (the "Agreement") is attached as Exhibit A.

9.      The terms and conditions of such Agreement required Defendant to pay a flat monthly service fee for services rendered by Plaintiff to the Defendant.

10.     On or about September 15, 2019, Plaintiff sent an invoice for services performed to Defendant pursuant to the Agreement (the "Invoice"). A copy of the Invoice is attached hereto as Exhibit B.

11.     On or about September 23, 2019, Defendant sent a notice of termination (the "Notice") to the Plaintiff cancelling the Agreement upon thirty days written notice. A copy of the Notice is attached hereto as Exhibit C.

12.     Pursuant to the Agreement, Defendant is required to pay all outstanding fees up to the date of actual termination.

13.     Plaintiff has duly performed all of its conditions and obligations required under the contract.

14.     Upon demand by Plaintiff, Defendant has refused to pay to Plaintiff the amount due and owing under the terms of the contract.

### COUNT ONE: BREACH OF CONTRACT – JULY 2019

15.     Plaintiff hereby re-alleges and incorporates by reference herein the prior allegations contained in this Complaint.

16.     Plaintiff rendered services to Defendant pursuant to the oral agreement commencing in July 2019.

17.     Plaintiff has duly performed all of its conditions and obligations required under the oral contract.

18.     Upon demand by Plaintiff, Defendant has refused to pay to Plaintiff the amount due and owing under the terms of the oral contract.

19.     Defendant breached its oral contract with Plaintiff by not paying the amounts due to Plaintiff for services rendered to Defendant by Plaintiff under the oral contract.

20.     Defendant, through its breach, has proximately caused damage to Plaintiff in the amount of $150,000.00.

## COUNT TWO: BREACH OF IMPLIED CONTRACT

21.     Plaintiff hereby re-alleges and incorporates by reference herein the prior allegations contained in this Complaint.

22.     Plaintiff, in reliance on the outward manifestations of Defendant's assent, rendered services to Defendant pursuant to an implied contract commencing in July 2019.

23.     Plaintiff has duly performed all of its conditions and obligations required under the implied contract.

24.     Upon demand by Plaintiff, Defendant has refused to pay to Plaintiff the amount due and owing under the terms of the implied contract.

25.     Defendant breached its implied contract with Plaintiff by not paying the amounts due to Plaintiff for services rendered to Defendant by Plaintiff under the implied contract.

26.     Defendant, through its breach, has proximately caused damage to Plaintiff in the amount of $150,000.00.

## COUNT THREE: BREACH OF CONTRACT

27.     Plaintiff hereby re-alleges and incorporates by reference herein the prior allegations contained in this Complaint.

28.     Plaintiff rendered services to Defendant pursuant to the contract commencing in August 2019.

29.     Plaintiff has duly performed all of its conditions and obligations required under the contract.

30.     Upon demand by Plaintiff, Defendant has refused to pay to Plaintiff the amount due and owing under the terms of the contract.

31.     Defendant breached its contract with Plaintiff by not paying the amounts due to Plaintiff for services rendered to Defendant by Plaintiff under the contract.

32.     Defendant, through its breach, has proximately caused damage to Plaintiff in the amount of $1,809,677.42.

## COUNT FOUR: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

33.     Plaintiff hereby re-alleges and incorporates by reference herein the prior allegations contained in this Complaint.

34.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.  This implied covenant requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement.  Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party.

35.     By engaging in the conduct set forth above, Defendant breached the implied covenant of good faith and fair dealing.

36.     Defendant, through its breach, has proximately caused damage to Plaintiff in the amount of $1,959,677.42.

**COUNT FIVE: PROMISSORY ESTOPPEL**

37.     Plaintiff hereby re-alleges and incorporates by reference herein the prior allegations contained in this Complaint.

38.     Plaintiff, in reliance upon an oral or implied agreement with Defendant, provided services to Defendant during July 2019 with the expectation of being compensated for the same.

39.     Plaintiff's reliance upon this oral agreement was reasonable as a formal written agreement memorializing the oral agreement was executed on or about August 1, 2019.

40.     Plaintiff, in reliance upon the written Agreement with Defendant, provided services to Defendant during August and September 2019 with the expectation of being compensated for the same.

41.     Plaintiff's reliance upon this Agreement was reasonable as a formal written agreement memorializing the terms of the same was executed on or about August 1, 2019.

42.     It would be unjust for Defendant to retain the benefit of the services performed in July through September 2019 without adequately compensating Plaintiff.

43.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial, but no less than $1,959,677.42.

**COUNT SIX: UNJUST ENRICHMENT**

44.     Plaintiff hereby re-alleges and incorporates by reference herein the prior allegations contained in this Complaint.

45.     Plaintiff conferred a benefit upon Defendant in the form of services provided to Defendant during July 2019.

46.     Plaintiff conferred an additional benefit upon Defendant in the form of services provided under the Agreement commencing August 1, 2019.

47.     By failing to pay any compensation to Plaintiff, Defendants have been unjustly enriched by Plaintiff's services rendered, for which Plaintiff never received payment.

48.     As a result of Defendant's unjust enrichment, Plaintiff is entitled to recover damages in an amount to be proven at trial, but no less than $1,959,677.42.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff, JMK 3, LLC, demands judgment against Defendant, The Geneus Group, LLC pursuant to Counts One, Two, Three, Four, Five and Six above in the amount of $1,959,677.42 together with interest, plus costs, attorney's fees, and any such further relief as the Court deems just and equitable.

Dated: January 3, 2020.                      Respectfully submitted,

Mistee L. Elliott (6-3540)
Holly L. Tysse (7-5553)
**CROWLEY FLECK PLLP**
101 W. Brundage
Sheridan, WY 82801
Ph: 307-673-3019
melliott@crowleyfleck.com
htysse@crowleyfleck.com

&

Amanda L. Waesch (Ohio Bar # 0083949)
*Pro Hac Vice Forthcoming*
Bryan E. Meek (Ohio Bar # 0093554)
*Pro Hac Vice Forthcoming*
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street, Akron, OH 44308
PH: 330-253-5060
alwaesch@bmdllc.com
bmeek@bmdllc.com

## JURY DEMAND

JMK 3, LLC demands a trial by jury on all issues so triable.

_____

Counsel for Plaintiff

# MANAGEMENT SERVICES AGREEMENT

Effective as of the 1st day of August, 2019, The Geneus Group, LLC ("Client" or "Company") agrees to engage JMK3, LLC ("Contractor" or "Service Provider") to perform certain professional services as outlined in **Addendum A** (the "Engagement") as discussed between the parties and agrees to pay for services performed under this Management Services Agreement (hereinafter, this "Agreement"). This Agreement shall supersede any prior discussions regarding the engagement and shall govern the engagement until such time the parties terminate the agreement or modify the agreement in writing.

1.   **Services.** The services provided under this Management Services Agreement are outlined in **Addendum A** attached hereto.

2.   **Fees.** Client shall pay Contractor using the professional services fee schedule provided in **Addendum A** attached hereto.  All terms and conditions of payment set forth in **Addendum A** are attached hereto and incorporated herein by reference. Contractor shall provide monthly reports of all personnel and/or hours worked on Client projects that shall include the name of the resource, time expended, and a summary of the work performed.  If, at any time, the disposition of this Engagement becomes out of character with the deliverables and estimates provided herein, either party shall have the right to renegotiate the deliverables, terms, and conditions of this Engagement. No modifications to this Engagement will be enforced or binding without an addendum or replacement agreement signed by both parties.

3.   **Term.** This Agreement shall remain in full force and effect for an initial term of twelve (12) months ("Initial Term"), and unless otherwise terminated in accordance with the terms hereof, shall thereafter automatically renew for successive one (1) year periods (each, a "Renewal Term" and collectively with the Initial Term, the "Term") on the same terms and conditions contained herein.  In the event this Agreement is terminated for any reason during a Term, the Parties shall not enter into another agreement for the same or similar Services until the end of one (1) year following the Term that was in place at the time of termination of this Agreement.

4.   **Expenses.** Client agrees to reimburse reasonable expenses incurred by Contractor associated with the execution of certain professional services contemplated herein and for all travel expenses associated with executing the services.  Contractor will be required to submit expenses reports each month detailing all incurred expenses. Any single expense over five hundred dollars ($500.00) must be pre-approved by Client. Expense reports without enclosed receipts or other proof of payment will not be reimbursed by the Client.

5.   **Confidentiality / HIPAA.** Contractor and Client agree that each shall safeguard the designated confidential and valuable information of the other.  Contractor shall not, without the prior written consent of Client, disclose to anyone any of the "Confidential Information" of Client or Client's assets or holdings, healthcare companies, or referring providers.  For the purposes of this Engagement, Client's "Confidential Information" shall mean all proprietary and confidential information including, but not limited to, all provider information, patient information, client lists, including but not limited to financial information, unless such information is publicly available. The "Confidential Information" shall not include any information necessary to be disclosed pursuant to or as a result of any judicial or regulatory process as required under law.  Contractor

and Client agree to execute the Business Associate Agreement provided in Exhibit B in association with potential Protected Health Information (PHI) as defined under HIPAA.

6.     Compliance with Laws.   In connection with Contractor's performance of this Engagement, Contractor, for self and as to every other person or entity related to Contractor and involved in the performance of this Engagement, covenants and agrees that it has and will comply fully and in a timely manner with all applicable state and federal laws, and regulations as they may apply to the duties and the performance in and under any and all parts of this Engagement. This agreement may be reformed to meet changing state and federal regulations governing this Engagement as legislation is newly enacted, modified, or narrowed through the judicial process.

7.     Debarment.   The parties represent and certify that they have not been debarred by any relevant governmental or regulatory authority. Further, if either party employs or engages any other person or entity to perform any services under this Agreement, the employing or engaging party represents that it has no knowledge of such person or entity having been debarred. Furthermore, Contractor represents and warrants to Client that Contractor and Contractor's representatives (i) are not currently excluded, debarred, or otherwise ineligible to participate in the Federal healthcare programs as defined in 42 USC 3120a-7b(f) (the "Federal healthcare program"); (ii) are not convicted of a criminal offense related to the provision of health care items or services but have not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs; and (iii) are not under investigation or otherwise aware of any circumstances which may result in Contractor or Contractor's Representatives being excluded from participation in the Federal health care programs. This shall be an ongoing representation and warranty during the term of this Engagement and Contractor shall immediately notify Client of any change in the status of the representation and warranty set forth in this section.

8.     Contacts / Notices.   The parties agree that the following individuals will serve as contacts on the Engagement and have authority to make decisions relating to the services provided by Contractor, including decisions relating to the scope of work and the acceptance of deliverables:

> **Contractor Contact:**
> JMK3, LLC
> 631 US Hwy One
> Suite 101-B
> N. Palm Beach, Florida 33408
>
> **Client Contact:**
> The Gencus Group, LLC
> Attn: Scott Seedall
> PO Box 12170
> Jackson, Wyoming 83002
> Telephone 307-203-7832

Any notice, demand, or request required or permitted to be given by a party pursuant to this Agreement shall be made in writing and shall be deemed effective (i) when delivered personally (with written acknowledgement of receipt by party to whom notice is so intended), (ii) upon receipt of delivery if sent by facsimile, email, or third-party courier service (where receipt is verified by the receiving party's acknowledgment), or (iii) five (5) business days after having been deposited in the United States mail, postage prepaid, registered or certified, and addressed to the

party at its address set forth above. Any party may change its address for purposes of this Agreement by written notice given in accordance herewith.

9.    Restrictive Covenants. Each Party agrees that in order to preserve the confidentiality of the Confidential and Proprietary Information, to prevent the theft or misuse of the Confidential and Proprietary Information, to protect each Party's customer/client relationships with its existing customers/clients, to protect its customer/client goodwill, and to protect each Party from improper or unfair competition, each Party agrees to the following Restrictive Covenants:

### A. Non-Solicitation of Employees and Consultants.
During the term of this Agreement and for a period of twenty-four (24) months from the termination of the Agreement, it is agreed by both parties not to solicit, divert, or attempt to solicit or divert, from either Party any employee, consultant, or any person providing services to, or on behalf of, each Party, or influence any such person to no longer serve as an employee, consultant, or provide services to, or for, each Party;

### B. Non-Solicitation / Non-Circumvention.
During the term of this Agreement and for a period of twelve (12) months from the termination of this Agreement, it is agreed by both parties that neither shall not, directly or indirectly, either itself or through any employee, independent Hospital, affiliate, subsidiary or other individual or entity, solicit or intentionally induce or otherwise influence any referral sources, vendors, business relationships, Laboratories, healthcare providers, of the other party, or any other individual or entity that has a business relationship with the other party, whether related to this Agreement or not, to work, deal, or engage in its business directly with Company or any affiliate or subsidiary or successor of the other party, to discontinue or reduce the extent of such relationship with either party, or to otherwise take any action to circumvent the existing business relationships between the other party and such referral sources, vendors, business relationships, Laboratories, healthcare providers or other customers, and any such other individual or entity that has a business relationship with that party.

### C. Non-Work with Customers/Clients.
During the term of this Agreement and for a period of twelve (12) months from the termination of this Agreement, it is agreed by both parties not to manage, operate, be connected with, employed by, sell goods to, or perform services for, or on behalf of, in any manner, to any customer or Account of Contractor such as an Account; and

### D. Non-Interference with Suppliers.
During the term of this Agreement and for a period of twelve (12) months from the termination of this Agreement, it is agreed by both parties to not interfere, or seek to interfere, with the continuance of supplies to either Party (or the terms relating to such supplies) from any suppliers who supplied goods or services to that Party.

### E. Non-Discussion of Agreement and Clients.
During the term of this Agreement, it is agreed by both parties to not discuss with any third party the terms of this Agreement, the name and identification of clients

and suppliers and any other information that would reveal the business operation between the Parties.

10.    Termination. In the event that either party wishes to terminate this Engagement they shall have the right to do so, with or without cause, by providing a written notice of termination at least thirty (30) days prior to said termination. In the event that this Agreement is terminated, Client shall immediately pay any outstanding invoices, fees, or expenses up to the date of actual termination.

11.    Relationship of the Parties. The relationship of the parties will be that of independent contractors, and nothing contained herein will be deemed to create any relationship of agency, joint venture or partnership. Neither party hereto will have any power to commit, contract for or otherwise obligate the other to any third person. Neither party shall be responsible for the payment of employee compensation, benefits and employment and other taxes pertaining to the employees of the other party.

12.    Disclaimers; Limitation of Liability; Exclusive Jurisdiction.
CLIENT, ITS AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, AGENTS, AND LICENSORS HEREBY DISCLAIM ALL WARRANTIES, GUARANTEES, AND REPRESENTATIONS, WHETHER EXPRESS OR IMPLIED, REGARDING THE MERCHANTIBILITY, TITLE, AND FITNESS FOR A PARTICULAR PURPOSE OF THE SERVICES OR PRODUCTS PROVIDED PURSUANT TO THIS AGREEMENT. THE MAXIMUM LIABILITY OF EITHER PARTY, THEIR DIRECTORS, OFFICERS, PARENT COMPANY, AND AFFILIATES, TO THE OTHER FOR DAMAGES FOR ANY AND ALL CAUSES WHATSOEVER, AND EACH PARTY'S MAXIMUM REMEDY, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT OR OTHERWISE, SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE TOTAL FEES PAID OR PAYABLE BY CLIENT TO CONTRACTOR HEREUNDER. IN NO EVENT SHALL EITHER PARTY, ITS DIRECTORS, OFFICERS, PARENT COMPANY, AND AFFILIATES BE LIABLE FOR ANY LOST DATA OR CONTENT, LOST PROFITS, BUSINESS INTERRUPTION OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS AGREEMENT SHALL BE GOVERNED UNDER THE LAWS OF THE STATE OF WYOMING. ANY ACTION ARISING OUT OF THIS AGREEMENT OR ARISING OUT OF THE RELATIONSHIP CREATED BY THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN A COURT OF APPROPRIATE JURISDICTION LOCATED IN TETON COUNTY, WYOMING.

13.    Entire Agreement. This Agreement, when executed, embodies the entire agreement of the parties on the subject matter thereof and supersedes all prior or contemporaneous agreements, as well as any other proposals, and all other communication between the parties relating to the subject matter hereof. No amendment or modification of this Agreement will be valid or binding upon Client or Contractor unless made in writing and signed by the parties.

14.    Counterparts. This Agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.  Assignment. Neither party may assign or transfer any of its rights under this Agreement or delegate any of its duties under this agreement to any third party other than its affiliates without the other party's prior written consent, except that an assigning party may so assign, transfer or delegate without the other party's consent pursuant to a transfer of all or substantially all of the assigning party's business and assets, whether by merger, sale of assets, sale of stock, or otherwise or to an affiliated entity.  Any attempted assignment or transfer in violation of the foregoing will be void.

**AGREED AND ACCEPTED:**

**JMK3, LLC**                                   **THE GENEUS GROUP, LLC**

Printed Name:                                   Printed Name:

   Joseph Kasbee
_____                _____

Signed:                                         Signed:

_____                _____

# ADDENDUM A

This **Addendum** A includes a listing of the services that will be rendered under the Agreement with the Effective Date of August 1, 2019 and executed between The Geneus Group, LLC hereafter ("Client") and JMK3, LLC, 631 Hwy One, Suite 101-B, N. Palm Beach, Florida 33408; hereafter ("Contractor") The parties agree that the nature of the services may evolve in time and, as such, the parties may develop modifications and/or replacement addendums, which shall be modified and enacted in strict accordance with the terms of this Addendum. For the avoidance of doubt, no changes to the services will be effective without written authorization and approval by both parties.

1. Services. The services provided under this Agreement include:

   - Marketing and brand awareness services to include, but not be limited to: patient outreach, brand development, brand awareness, marketing communications development, telephone campaigns (using approved, Opt-In Patients only).

   - Logistics management services to include, but not be limited to: coordination of mailing / shipping addresses of patients who desire diagnostic testing services, coordination and facilitation of patient scheduling for physician consultations, coordination of updates to patients regarding diagnostic testing status and any necessary re-tests.

2. Compliance & Obligations. Contractor certifies that no portion of any payment they have received from the Company or any affiliated entity is paid, shared, or otherwise given to any referring physician, practice manager, beneficiary, or any other individual or entity in a position to influence referrals directly or indirectly. Contractor agrees at all times to abide and adhere to all restrictions, requirements, and guidelines as provided by Stark Law and the Anti-Kickback Statute:

   **Stark Law.**
   The federal physician self-referral and payment prohibitions (42 U.S.C. § 1395nn; Section 1877 of the Social Security Act) generally forbid, absent qualifying for one of the enumerated exceptions, a physician from making referrals for the furnishing of any "designated health services," for which payment may be made under the Medicare or Medicaid programs, to any entity with which the physician (or an immediate family member) has a "financial relationship." The legislation was effective January 1, 1992 for clinical laboratory services and January 1, 1995 for ten other designated health services. The designated health services are: (1) clinical laboratory services; (2) physical therapy services; (3) occupational therapy services; (4) radiology, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; (5) radiation therapy services and supplies; (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices; (9) home health services and supplies; (10) outpatient prescription drugs; and (11) inpatient and outpatient hospital services. An "entity" includes any health care provider or supplier that bills the Medicare or Medicaid programs for designated health services, including the Hospitals. A "financial relationship" under Stark includes any direct or indirect "compensation arrangement" with an

entity for payment of any remuneration, and any direct or indirect "ownership or investment interest" in the entity.

**Anti-Kickback Statute.**
The Medicare and Medicaid Anti-Fraud and Abuse Amendments to the Social Security Act (42 U.S.C. § 1320a - 7a & 7b, hereinafter referred to as the "Anti-Kickback Statute") prohibit certain actions and practices deemed to be fraudulent or abusive in nature. The Anti-Kickback Statute prohibits the offering, payment, solicitation, or receipt of any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, for: (i) the referral of patients or arranging for the referral of patients to receive any items or services for which payment may be made in whole or in part under Government Health Care Programs; and (ii) the purchase, lease, order, or arranging for, or recommending, the purchase, lease, or order, of any good, facility, service or item for which payment may be made, in whole or in part, under a Government Health Care Program.

3.  Compensation.    Contractor shall be paid based on the number of contracted call center representatives and/or agents who are dedicated to the project and the scope and amount of the actual services performed.  The parties agree that the total compensation for the Contractor's services, shall not in any way be related to the value, volume, or adjudication of referrals between the parties. The parties agree that this Agreement will remain in effect for a period of one (1) year and that the terms of the agreement will not be altered or changed within that one-year time period. The parties may agree by addendum to this Agreement to increase or decrease the number of contracted representatives and/or agents who are dedicated to the project with the objective of not making more than one addendum during the one year term unless warranted by exceptional circumstances. The following rate structure shall be used during the term of this Agreement. The flat fee rate structure represents the fair market value of the services rendered by the Contractor under this Addendum:

**The Contractor shall be paid a flat monthly fee for actual services provided estimated to be $660,000.00 for the term of this Agreement.**

4.  Conditions of Payment. The Client and Contractor certify that the fees set forth in this Addendum have resulted from the parties' arm's length negotiations, do not take into account any volume or value of referrals or business otherwise generated between the parties and are consistent with the fair market value for the services, which require, among others, the Contractor's support personnel, equipment, and management information systems and all of which are provided at Contractor's sole risk and expense on behalf of the Client. Nonetheless, the parties acknowledge that to negotiate the fair market value for the Services, the Parties have considered: (a) factors specific to the Services including the particular requirements and nature of the associated duties and responsibilities; (b) Services specific objectives and deliverables; (c) the specific skills and unique qualifications that the Contractor brings regarding the Services and to the Client including its business expertise, leadership experience and reputation; (d) the extent of the time requirements associated with the provision of the contemplated Services including the required allocation of hours for each duty and responsibility); and, (e) the anticipated value and benefits which the Client can expect to realize from (and the risks being assumed by) the Contractor in committing financial, managerial and other resources and incurring expenses and obligations to provide the Services.

5. Invoicing & Payment Frequency. Contactor shall invoice Client for the services rendered under the following schedule:

   a. For services provided between the first day and the fifteenth day of a calendar month, the invoice will be issued on the 15th day of the following month. By way of example, services provided from August 1, 2019 through August 15, 2019 would be invoiced on September 15, 2019.
   b. For services provided between the sixteenth day of a calendar month and the last day of such month, the invoice will be issued on the first day of the second month following. By way of example, services provided between August 16, 2019 and August 31, 2019 shall be invoiced October 1, 2019.
   c. Payment shall be due within five business days from receipt of the invoice. All payments shall be paid using ACH / wire transfers unless otherwise agreed upon by both parties.

6. Deliverables. From time to time the parties may also create discrete deliverables that are in line with the service capabilities provided herein. Such deliverables will be in writing and accepted by the parties prior to implementation of the work effort.

**AGREED AND ACCEPTED:**

**THE GENEUS GROUP, LLC**                    **JMK3, LLC**

Printed Name:                                Printed Name:

   Scott Scedell                           Joseph Kasbee

Signed:                                      Signed:

# ADDENDUM B

## Business Associate Agreement

THIS BUSINESS ASSOCIATE AGREEMENT (this "Agreement") is entered into as of August 1, 2019 (the "Effective Date") specified on this Agreement is between THE GENEUS GROUP, LLC ("Client" or "Covered Entity", and the undersigned "Business Associate".   Client enters into and accepts this Agreement and the terms and conditions hereof as of the Effective Date. In consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

### RECITALS:

WHEREAS, pursuant to the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), the U.S. Department of Health & Human Services ("DHHS") promulgated the Standards for Privacy of Individually Identifiable Health Information (the "Privacy Standards"), at 45 C.F.R. Parts 160 and 164, requiring certain individuals and entities subject to the Privacy Standards (each a "Covered Entity," or collectively "Covered Entities") to protect the privacy of certain individually identifiable health information ("Protected Health Information," or "PHI"); and

WHEREAS, pursuant to HIPPA, DHHS has issued the Security Standards (the "Security Standards"), at 45 C.F.R. Parts 160, 162 and 164, for the protection of electronic protected health information ("EPHI"); and

WHEREAS, in order to protect the privacy and security of PHI, including EPHI, created or maintained by or on behalf of the Covered Entity, the Privacy Standards and Security Standards require a Covered Entity to enter into a "business associate agreement" with certain individuals and entities providing services for or on behalf of the Covered Entity if such services require the use or disclosure of PHI or EPHI; and

WHEREAS, on February 17, 2009, the federal Health Information Technology for Economic and Clinical Health Act was signed into law (the "HITECH Act"), and the HITECH Act imposes certain privacy and security obligations on Covered Entities in addition to the obligations created by the Privacy Standards and Security Standards; and

WHEREAS, the HITECH Act revises many of the requirements of the Privacy Standards and Security Standards concerning the confidentiality of PHI and EPHI, including extending certain HIPPA and HITECH Act requirements directly to business associates; and

WHEREAS, the HITECH Act requires that certain of its provisions be included in business associate agreements, and that certain requirements of the Privacy Standards be imposed contractually upon Covered Entities as well as business associates; and

WHEREAS, the Business Associate provides certain consulting, software, and technical services as a vendor of the Covered Entity ("Services") to Covered Entity pursuant to an arrangement in which Covered Entity may disclose to Business Associate certain information that will be subject to protection under the Privacy and Security Standards and Business Associate, as a recipient of PHI and EPHI from Covered Entity, is a "business associate" as that term is defined in the Privacy Standards; and

WHEREAS, pursuant to the Privacy and Security Standards, all business associates of Covered Entity must agree in writing to certain mandatory provisions regarding the use and disclosure of PHI and EPHI; and

WHEREAS, it is the mutual intent of Covered Entity and the Business Associate to enter into this Agreement in order for Covered Entity to comply with the Privacy Standards and the Security Standards; and

NOW, THEREFORE, in consideration of the agreements, covenants, terms and conditions herein contained and other consideration, the sufficiency of which is hereby acknowledged, Covered Entity and the Business Associate hereby agree as follows:

## I. DEFINITIONS FOR USE IN THIS AGREEMENT.
"Individually Identifiable Health Information" shall mean information that is a subset of health information, including demographic information collected from an individual, and:
- (i) Is created or received by a health care provider, health plan, employer, or healthcare clearinghouse; and
- (ii) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of healthcare to an individual; or the past, present, or future payment for the provision of healthcare to an individual; and
    - (a) Identifies the individual, or
    - (b) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.

"Protected Health Information" or "PHI" shall mean Individually Identifiable Health Information that is (i) transmitted by electronic media; (ii) maintained in any medium constituting Electronic Media; or (iii) transmitted or maintained in any other form or medium. "PHI" or "EPHI" shall not include (y) education records covered by the Family Educational Right and Privacy Act, as amended, 20 U.S.C. § 1232g; and (z) records described in 20 U.S.C.§ 1232g(a)(4)(B)(iv). For instance, PHI includes information contained in a patient's medical records and billing records.

"Electronic Protected Health Information" or "EPHI" shall have the meaning found in the Security Standards, 45 C.F.R § 160.103.

"Data Aggregation" shall mean, with respect to PHI or EPHI created or received by the Business Associate in its capacity as the business associate of Covered Entity, the combining of such PHI or EPHI by the Business Associate with the PHI or EPHI received by the Business Associate in its capacity as a Business Associate of another covered entity, to permit data analyses that relate to the health care operations of the respective covered entities. No Data Aggregation services are contemplated pursuant to this Agreement.

"Designated Record Set" shall mean a group of records maintained by or for Covered Entity that is (i) the medical records and billing records about individuals maintained by or for Covered Entity; (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for Covered Entity to make decisions about individuals. As used herein the term "Record" means any item, collection, or grouping of information that includes PHI or EPHI and is maintained, collected, used, or disseminated by or for Covered Entity.

"Electronic Media" shall mean the mode of electronic transmissions. It includes the Internet, extranet (using Internet technology to link a business with information only accessible to collaborating parties), leased lines, dial-up lines, private networks, and those transmissions that are physically moved from one location to another using magnetic tape, disk, or compact disk media.

"Privacy Standards" shall mean the Standards for Privacy of Individually Identifiable Health Information or "PHI", 45 C.F.R. Parts 160 and 164.

"Security Standards" shall mean the Security Standards for the Protection of Electronic Health Information or "EPHI" at 45 C.F.R. Part 160, 162 and 164.

"Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services ("DHHS") or any office or person within DHHS to which/whom the Secretary has delegated his or her authority to administer the Privacy Standards, such as the Director of the Office for Civil Rights.

Unless otherwise provided in this Agreement, capitalized terms in this Agreement shall have the meanings given to them in the Privacy Standards and Security Standards or the HITECH Act, as applicable (collectively referred to as the "Confidentiality Requirements"). All references to PHI herein shall be construed to include EPHI.

## II. OBLIGATIONS OF BUSINESS ASSOCIATE.

2.1. Use and Disclosure of PHI. Except as otherwise required by law, Business Associate shall use PHI in compliance with 45 C.F.R. § 164.504(e). Business Associate may use and disclose PHI only as required to satisfy its obligations in performance of Services for Covered Entity, as permitted herein, or required by law, but shall not otherwise use or disclose any PHI. The Business Associate shall not and shall ensure that its directors, officers, employees, contractors, and agents do not use or disclose PHI received from Covered Entity in any manner that would constitute a violation of the Privacy Standards if used by Covered Entity, except that the Business Associate may use PHI (i) for the Business Associate's proper management and administration, provided that if Business Associate discloses any PHI to a third party for such a purpose, Business Associate shall enter into a written agreement with such third party requiring that party (1) to hold the PHI confidentially and not to use or further disclose the PHI except as required by law, and (2) to notify Business Associate immediately of any instances of which it becomes aware in which the

confidentiality of the PHI is breached, (ii) to carry out the legal responsibilities of the Business Associate, or (iii) to provide data-aggregation services relating to the healthcare operations of Covered Entity   if required in performance of the Services, which use is not currently contemplated. The Business Associate acknowledges that, as between the Business Associate and Covered Entity, all PHI shall be and remain the sole property of Covered Entity, including any and all forms thereof developed by the Business Associate in the course of its fulfillment of its obligations pursuant to the Agreement. The Business Associate further represents that, to the extent the Business Associate requests that Covered Entity disclose PHI to the Business Associate, such a request is only for the minimum necessary PHI for the accomplishment of the Business Associate's purpose.

2.2.   Minimum Necessary Standard.   To the extent required by the "minimum necessary" requirements of the Privacy Standards, the Business Associate shall only request, use, and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use, or disclosure. Additionally, Business Associate shall comply with Section 13405(b) of the HITECH Act, and any regulations or guidance issued by DHHS concerning such provision, regarding the minimum necessary standard and the use and disclosure (if applicable) of Limited Data Sets.

2.3. Safeguards Against Misuse of Information. The Business Associate shall use all appropriate safeguards to prevent the use or disclosure of PHI other than as permitted under this Agreement. Business Associate acknowledges that the HITECH Act requires Business Associate to comply with 45 C.F.R. §§ 164.308, 164.310, 164.312 and 164.316 as if Business Associate were a Covered Entity, and Business Associate agrees to comply with these provisions of the Security Standards and all additional security provisions of the HITECH Act. Furthermore, to the extent feasible, Business Associate will use commercially reasonable efforts to ensure that the technology safeguards used by Business Associate to secure PHI will render such PHI unusable, unreadable and indecipherable to individuals unauthorized to acquire or otherwise have access to such PHI in accordance with DHHS Guidance published at 74 Federal Register 19006 (April 17, 2009), or such later regulations or guidance promulgated by DHHS or issued by the National Institute for Standards and Technology ("NIST") concerning the protection of identifiable data such as PHI.

2.4. Reporting of Disclosures of PHI. The Business Associate shall, as soon as practicable, but in no event later than within ten (10) days of becoming aware of any use or disclosure of PHI in violation of the Agreement by the Business Associate, its officers, directors, employees, contractors, or agents or by a third party to which the Business Associate disclosed PHI pursuant to Section 2.5, report any such disclosure to Covered Entity. In such event, the Business Associate shall, in consultation with Covered Entity, mitigate, to the extent practicable, any harmful effect that is known to the Business Associate of such improper use or disclosure. The Business Associate will report within ten (10) days to Covered Entity any Security Incident involving EPHI created or received by Business Associate for or from Covered Entity.

2.5. Agreements by Third Parties   The Business Associate shall obtain and maintain an agreement with each agent or subcontractor that has or will have access to PHI, which is received from, or created or received by, the Business Associate on behalf of Covered Entity, pursuant to which agreement such agent or subcontractor agrees to be bound by the same restrictions, terms, and conditions that apply to the Business Associate pursuant to the Agreement with respect to such PHI.

2.6.1 Access to PHI by Individual. If Business Associate maintains PHI of the Covered Entity's patients, the Business Associate shall make available to Covered Entity such PHI for so long as

such information is maintained in the Designated Record Set under the conditions and limitations required under 45 C.F.R. §164.24, as it may be amended from time to time. In the event any individual requests access to PHI directly from the Business Associate, the Business Associate shall within five (5) days forward such request to Covered Entity. Business Associate may charge a reasonable fee based upon Business Associate's labor costs in responding to a request for electronic information (or a cost-based fee for the production of non-electronic media copies).

2.6.2. Access to PHI by Non-Individual. The Business Associate agrees to notify Covered Entity within three (3) business days of the Business Associate's receipt of any request or subpoena for PHI from a person other than the individual.

2.6.3 Challenges, Denials to Request for Access. Covered Entity shall be responsible for challenging the validity of or denying requests for access as described above and the Business Associate shall cooperate fully with Covered Entity in such challenge or denial.

2.7. Availability of PHI for Amendment. Within ten (10) days of receipt of a request from Covered Entity for the amendment of an individual's PHI or a record regarding an individual contained in a Designated Record Set (for so long as the PHI is maintained in the Designated Record Set), the Business Associate shall provide such information to Covered Entity for amendment and incorporate any such amendments in the PHI as required by 45 C.F.R. § 164.526.

2.8. Accounting of Disclosures. Business Associate shall make available to Covered Entity in response to a request from an individual, information required for an accounting of disclosures of PHI with respect to the individual in accordance with 45 C.F.R. §164.528, as amended by Section 13405(c) of the HITECH Act and any related regulations or guidance issued by DHHS in accordance with such provision. Business Associate shall provide to Covered Entity such information necessary to provide an accounting within thirty (30) days of Covered Entity's request or such shorter time as may be required by state or federal law, other than relating to disclosures made earlier than six (6) years prior to the date on which the accounting was requested. Such accounting must be provided without cost to the individual or to Covered Entity if it is the first accounting requested by an individual within any twelve (12) month period. For subsequent accountings within a twelve (12) month period, Business Associate may charge a reasonable fee based upon the Business Associate's labor costs in responding to a request for electronic information (or a cost-based fee for the production of non-electronic media copies) so long as Business Associate informs the Covered Entity and the Covered Entity informs the individual in advance of the fee, and the individual is afforded an opportunity to withdraw or modify the request. Further, Business Associate agrees that upon termination or expiration of the Services, Associate shall provide to Covered Entity an accounting of all such disclosures made since the compliance date of the Privacy Standards. In the event the request for an accounting is delivered directly to the Business Associate, the Business Associate shall within five (5) business days forward such request to Covered Entity.

2.9. Availability of Books and Records. Beginning on the Effective Date, the Business Associate shall provide Covered Entity with such information concerning its safeguards as Covered Entity may from time to time request, and shall, upon reasonable request, make its facilities used for the maintenance or processing of PHI and EPHI, its internal practices, books, records, policies and procedures relating to the use and disclosure of PHI and EPHI received from, or created or received by the Business Associate on behalf of Covered Entity available to Covered Entity for inspection and copying, or to the Secretary as designated by the Secretary for purposes of the Secretary

determining Covered Entity's and the Business Associate's compliance with the Privacy and Security Standards.

2.10. Injunction. The Business Associate acknowledges and agrees that Covered Entity will suffer irreparable damage upon the Business Associate's breach of this Agreement, and that such damages shall be difficult to quantify. The Business Associate acknowledges and agrees that Covered Entity may file an action for an injunction to enforce the terms of this Agreement against the Business Associate, in addition to any other remedy Covered Entity may have.

2.11. Business Associate Security Rule Responsibilities. To the extent required by the Security Standards, Business Associate has implemented and shall maintain administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic PHI that it creates, receives, maintains, or, if applicable, transmits on behalf of the Covered Entity. Business Associate shall ensure that any agent, including a subcontractor, to whom it provides EPHI, agrees to implement reasonable and appropriate safeguards to protect such EPHI. Such safeguards for electronic PHI are consistent with the requirements applicable to Covered Entities under the Security Rule (45 C.F.R. Part 164, Subpart C). Business Associate acknowledges that the HITECH Act requires Business Associate to comply with 45 C.F.R. §§ 164.308, 164.310, 164.312 and 164.316 as if Business Associate were a Covered Entity, and Business Associate agrees to comply with these provisions of the Security Standards and all additional security provisions of the HITECH Act. Furthermore, to the extent feasible, Business Associate will use commercially reasonable efforts to ensure that the technology safeguards used by Business Associate to secure PHI will render such PHI unusable, unreadable and indecipherable to individuals unauthorized to acquire or otherwise have access to such PHI in accordance with DHHS Guidance published at 74 Federal Register 19006 (April 17, 2009), or such later regulations or guidance promulgated by DHHS or issued by the National Institute for Standards and Technology ("NIST") concerning the protection of identifiable data such as PHI.

2.12. Withdrawal of Authorization. If the use or disclosure of PHI in this Agreement is based upon an individual's specific authorization for the use of his or her PHI, and (i) the individual revokes such authorization in writing, (ii) the effective date of such authorization has expired, or (iii) the consent or authorization is found to be defective in any manner that renders it invalid, Business Associate agrees, if it has notice of such revocation or invalidity, to cease the use and disclosure of any such individual's PHI except to the extent it has relied on such use or disclosure, or where an exception under the Confidentiality Requirements expressly applies.

## III. TERMINATION OF AGREEMENT WITH BUSINESS ASSOCIATE.

3.1. Termination Upon Breach of Provisions Applicable to PHI. This Agreement and the Services may be terminated by Covered Entity upon ten (10) days' written notice to the Business Associate in the event that the Business Associate breaches any provision contained in this Agreement and such breach is not cured within such ten (10) day period; provided, however, that in the event, that termination of the Services is not feasible, in Covered Entity's sole discretion, the Business Associate acknowledges and agrees that Covered Entity has the right to report the breach to the Secretary, notwithstanding any other provision of the Agreement to the contrary. Either party may terminate this Agreement upon thirty (30) days written notice to the other party.

3.2. Return or Destruction of PHI upon Termination. Upon termination of this Agreement and except to the extent records are reasonably required to be retained in order for Business Associate to defend or protect itself or comply with applicable Laws, the Business Associate shall either return or destroy all Protected Health Information received from Covered Entity, or created or

received by the Business Associate on behalf of Covered Entity, and which the Business Associate still maintains in any form. The Business Associate shall not retain any copies of such PHI. Notwithstanding the foregoing, to the extent that Covered Entity agrees that it is not feasible to return or destroy such PHI, the terms and provisions of this Agreement shall survive termination of the Services, and such PHI shall be used or disclosed solely for such purpose or purposes which prevented the return or destruction of such PHI.

3.3. Covered Entity's Right of Cure. At the expense of the Business Associate, Covered Entity shall have the right to reasonably cure any breach of the Business Associate's obligations under this Agreement to the extent Business Associate has failed to cure such breach within the cure periods set forth in Section 3.1. Covered Entity shall give the Business Associate notice of its election to cure any such breach, and the Business Associate shall use commercially reasonable efforts to cooperate in the efforts by Covered Entity to cure the Business Associate's breach.

## IV. GENERAL PROVISIONS.

4.1. Entire Agreement and Effect. The terms and provisions of this Agreement shall supersede any other conflicting or inconsistent terms and provisions in any other agreement, whether oral or written, between the parties relating to the Services.

4.2. Amendment. The Business Associate and Covered Entity agree to amend this Agreement to the extent necessary to allow either party to comply with the Privacy Standards and the Security Standards under HIPPA and the HITECH Act (collectively, the "HIPPA Standards") promulgated or to be promulgated by the Secretary or other regulations or statutes, including any applicable state laws. The Business Associate agrees that it will fully comply with all such HIPAA Standards, and that it will agree to amend this Agreement to incorporate any material required by the HIPAA Standards.

4.3. Waiver. No provision of this Agreement or any breach thereof shall be deemed waived unless such waiver is in writing and signed by the Party claimed to have waived such provision or breach. No waiver of a breach shall constitute a waiver of or excuse any different or subsequent breach.

4.4. Assignment. Neither Party may assign (whether by operation or law or otherwise) any of its rights or delegate or subcontract any of its obligations under this Agreement without the prior written consent of the other Party.

4.5. Severability. Any provision of this Agreement that is determined to be invalid or unenforceable will be ineffective to the extent of such determination without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such remaining provisions.

4.6. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart executed by the party against whom enforcement of this Agreement is sought. Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in portable document format (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same force and effect as physical execution and delivery of the paper document bearing the original signature.

4.7. Notices. Any notice or other communication by either party to the other party required or permitted to be delivered hereunder shall be in writing and shall be deemed to have been given on the date of delivery if delivered in person, or if delivered by certified or registered mail, postage prepaid, return receipt requested, or other reputable delivery service such as Federal Express, upon the date indicated on the return receipt if addressed to the party as set forth above or at such other address, and to the attention of such other person, as either party may designate in writing from time to time.

**THE GENEUS GROUP, LLC**

Printed Name:

~~Scott Sordall~~

Signed:

**JMK3, LLC**

Printed Name:

Joseph Kasbee

Signed:

JMK3, LLC
631 US HWY ONE, Suite 101-B
North Palm Beach, FL 33408
Attn: Chuck Kasbee



## INVOICE NO. 1                                     9-15-19

**BILL TO**            **SHIP TO**           **INSTRUCTIONS**

The Geneus Group, LLC                        Please Wire funds: Banking instructions were sent in
Attn: Scott Seedall                          previous e-mail.
PO Box 12170
Jackson, Wyoming 83002
Telephone: 307-203-7832

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| | | July Marketing | $330,000.00 |
| | **• Marketing and brand awareness services to include, but not be limited to: patient outreach, brand development, brand awareness, marketing** | | |
| | **• Logistics management services to include, but not be limited to: coordination of mailing / shipping addresses of patients who desire diagnostic testing services, coordination and facilitation of patient scheduling for physician consultations, coordination of updates to patients regarding diagnostic testing status and any necessary re-tests** | | |

Exhibit B

*THE GENEUS GROUP, LLC*
*P.O. Box 12170*
*Jackson, Wyoming 83002*
*(307) 203-7832*

*September 23, 2019*

*JMK3, LLC*
*631 US Hwy 1*
*Suite 101-B*
*N. Palm Beach, FL 33408*

*RE:  Notice of Termination*

*Dear Mr. Kasbee and Mr. Ort,*

*Notice is hereby given that pursuant to Paragraph 10 of the Management Services Agreement dated August 1, 2019 that The Geneus Group, LLC is exercising its right to cancel the Agreement upon thirty days prior written notice to you.*

*You are further directed to immediately cease any and all activities or services which you may claim to be performing on behalf of The Geneus Group under the Agreement.  We are in receipt of an invoice from you dated September 15, 2019 for services allegedly performed during the month of July, 2019.*

*Exhibit A to the Management Services Agreement requires that payment be based on the number of call center representatives and/or agents who are dedicated to the project and the scope and amount of the actual services performed.  The compensation amount listed in the Exhibit is classified as "estimated" for a very specific reason: to prevent you from submitting an inflated invoice that in no way corresponds to any services performed.*

*In no way did your company provide any type of services to The Geneus Group that are even remotely close to the amount you have issued the invoice for.  Furthermore, the invoice is for services alleged to have been performed prior to August 1, 2019 which is the effective date of the Agreement.  Your invoice is nothing more than a fraudulent attempt to be paid for services that were never performed and work that was never done.  If the invoice is not immediately withdrawn we will proceed to file an action against you in Teton County, Wyoming as the mandatory jurisdiction set forth in the Agreement in order to protect our interests.  Of course during the discovery process we will seek to compel production from you of all company and individual employment, financial, banking, administrative, electronic mail, physical mail and other records kept in the normal course of business related to your claimed invoice amount. This shall therefore also serve as written notice to you that you are required to preserve any and*

Exhibit C

*all such records, regardless of whether such records are in physical form or electronic copy, regardless of the location or manner on which such records are stored. Failure to preserve any and all such records will be deemed sufficient for a spoliation of evidence claim to be included in the allegations against you.*

*As a final matter, you are advised that all rights, claims and defenses available to The Geneus Group, LLC against you are specifically reserved.*

*Sincerely,*

*Scott Seedall*
*The Geneus Group, LLC*